UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

JOHN RICHARD MANAGO,

                Plaintiff,

                    v.

KILOLO KIJAKAZI, *Acting Commissioner of Social Security*,[1]

                Defendant.

--------------------------------------------------------------

**MEMORANDUM & ORDER**
20-CV-1251 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff John Richard Manago commenced the above-captioned action on March 6, 2020, pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for supplemental security income ("SSI") under the Social Security Act (the "SSA"). (Compl., Docket Entry No. 1.) Plaintiff moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that the Administrative Law Judge Gloria Pellegrino (the "ALJ") selectively considered evidence supporting benign limitations while overlooking evidence that supported greater limitations, erred in assessing opinion evidence and relied too heavily on findings of a nonexamining state agency psychological consultant, and erred in assessing Plaintiff's failure to follow his prescribed treatment and his subjective complaints. (Pl.'s Mot. for J. on the Pleadings ("Pl.'s Mot."), Docket Entry No. 17; Pl.'s Mem. in Supp. of Pl.'s Mot.

---

    [1]  Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration, for Andrew M. Saul, the former Commissioner. *See Acting Commissioner,* Social Security, https://www.ssa.gov/agency/commissioner/ (last visited Sept. 13, 2021).

("Pl.'s Mem."), Docket Entry No. 18.)  The Commissioner cross-moves for judgment on the pleadings, arguing that the ALJ's decision is supported by substantial evidence and that the ALJ properly considered clinical findings and Plaintiff's subjective complaints.  (Comm'r's Cross-Mot. for J. on the Pleadings ("Comm'r's Mot."), Docket Entry No. 21; Comm'r's Mem. in Supp. of Comm'r Mot. ("Comm'r's Mem."), Docket Entry No. 22.)

For the reasons set forth below, the Court grants Plaintiff's motion for judgment on the pleadings, denies the Commissioner's cross-motion for judgment on the pleadings, and remands this case for further administrative proceedings.

## I.   Background

Plaintiff was born in 1989.  (Certified Admin R. ("R.") 150, Docket Entry No. 11.)  On June 1, 2016, Plaintiff filed an application for SSI, claiming an onset of disability on April 25, 2016, due to depression, anxiety, and asthma.  (R. 150–58, 175.)  On July 20, 2016, Plaintiff's application for SSI was denied.  (R. 65–68.)  Plaintiff subsequently requested a hearing before an administrative law judge, (R. 69–72), which was held on October 1, 2018, before the ALJ, (R. 8–29).[2]  By decision dated November 6, 2018, the ALJ found that Plaintiff was not disabled.  (R. 47–60.)  On January 15, 2020, the Appeals Council denied review, rendering the ALJ's decision the Commissioner's final decision.  (R. 1–3.)  Plaintiff filed a timely appeal with the Court. (Compl.)

### a.   Hearing before the ALJ

On October 1, 2018, Plaintiff appeared at the hearing with counsel.  (R. 10–11.)  The ALJ heard testimony from Plaintiff and vocational expert Dr. Eric Dennison (the "VE").  (R. 10–11.)

---

[2]  Plaintiff's hearing was initially scheduled for July 11, 2018, but was postponed after Plaintiff's representative failed to show up for the hearing and Plaintiff sought additional time to seek representation.  (R. 31–35.)

### i.  Plaintiff's function reports and hearing testimony

Plaintiff has a college education and received a master's degree in psychology at Queens College in 2013, where he achieved a 3.9 grade point average.  (R. 14, 176, 309–10.)

### 1.  Function reports

In a function report dated June 24, 2016, Plaintiff stated that he often goes outside alone, that he walks and uses public transportation, and that he has a valid driver's license but does not drive because it is stressful.  (R. 195.)  Plaintiff has no problems with personal care but his mother sometimes has to "encourage [him] to shave, shower and brush [his] teeth."  (R. 193–94.)  Plaintiff could shop for groceries and fix or prepare "[l]eftovers and frozen meals," but his mother usually prepares his meals.  (R. 194–95.)  Since his illness began, Plaintiff has not cooked or eaten as much as he did before.  (R. 194.)  Plaintiff's mother does most of the housework, but he is able to pay bills and handle a savings account.  (R. 195–96.)  Plaintiff spends time with others two to three times a week "when [he is] with [his] mother in support groups" and he regularly attends support groups and community events.  (R. 196.)  Plaintiff used to be more outgoing and wanted to socialize more prior to the onset of his illness.  (R. 197.)

In response to questions about his abilities, Plaintiff stated on the Function Report that he has difficulty paying attention because his "mind starts to wander" and he has memory issues.  (R. 198.)  Plaintiff could finish what he started and follow spoken and written instructions.  (R. 198–99.)  He did not have problems getting along with authority figures such as bosses, teachers, police, and landlords, and he has never lost a job because of problems getting along with people.  (R. 199.)  Plaintiff does not "like stress or changes in schedule."  (R. 199.)

Regarding his anxiety, Plaintiff's condition began on April 25, 2016, and he is "[f]eeling a little better with medication."  (R. 200.)  Plaintiff experiences daily panic attacks that last "[o]ff

and on all day" and his panic attacks are triggered by his "[j]ob situation," lack of socializing, depression, and worries about the future.  (R. 200–01.)  During a typical attack, Plaintiff felt a combination of "fear, rapid heartbeat, shortness of breath, [a] need to flee, sweating, confusion," and "hopelessness."  (R. 201.)  Plaintiff is unable to shop or drive during an attack, but he functions better "when the symptoms lessen."  (R. 201.)  Plaintiff sees Dr. Marta Partyka for treatment of his anxiety and his therapist, Jose Perez.  (R. 201.)  Plaintiff stated that he takes Paxil for his anxiety and that "[t]he treatment helps."  (R. 201.)

### 2.   Hearing testimony

At the hearing, Plaintiff testified that he lives in a house with his mother.  (R. 14.)  He uses the microwave "somewhat" but does not use the stove because he "used it one time and [it] . . . flamed up" and "burned a lot of food" which resulted in "a lot of smoke around the apartment."  (R. 22.)

Plaintiff looked at online job applications in the psychology field and sent his resume to one position.  (R. 14.)  Plaintiff worked briefly in 2016 and 2017, earning a few hundred dollars. (R. 170.)  In 2016, Plaintiff delivered papers part-time, but he was terminated for "no show-late notice" within one month.  (R. 159.)  More recently, Plaintiff worked delivering food for Amazon Fresh for five days, for McDonald's for a day and a half in June of 2018, and as a poll worker for one day.  (R. 15.)  Plaintiff's job at Amazon Fresh was stressful because he had to follow his boss' instructions and carry heavy bags up several flights of stairs.  (R. 16.)  He quit his job at McDonald's because of the "stress on the job" and he experienced anxiety and nervousness while working.  (R. 15.)

Plaintiff began receiving mental health treatment in late April to early May of 2016 because he was hearing voices, became nervous, and felt depressed.  (R. 16–17.)  Plaintiff

4

experienced "minor anxiety" throughout high school and college regarding but had not experienced any severe symptoms.  (R. 17.)  He currently sees a therapist weekly.  (R. 17.) Plaintiff previously saw a therapist at the Institute for Family Health ("IFH") but he no longer goes to therapy there because his relationship with his therapist was not "working well" and because he had difficulty making it to appointments on time because IFH was far away.  (R. 17–18.)  Plaintiff also previously received treatment at Queens Consultation Center ("QCC"), but he stopped going there because he did not like the direction his treatment was heading and because he had a bad relationship with the staff.  (R. 18.)

Plaintiff testified that he was not currently taking any medication and that "the psychiatrist — the nurse practitioner" said that he did not see a reason to prescribe medication at the current time.  (R. 19.)  Plaintiff had taken medication for his mental health in the past and experienced side effects of "nausea, dizziness, faint[ness], drows[iness], and a little sleep[iness]." (R. 19.)  Plaintiff stopped taking prescription medication seven months prior to the hearing but "went back on it . . . about . . . ten months of the year . . . for another three or four months."  (R. 19.)

Regarding social activities, Plaintiff testified that he runs, jogs, and walks because his therapist told him to stay active.  (R. 20.)  While he had been to support groups in the past, Plaintiff stopped going because there was too much arguing and because it was "more of like games and they had speakers and a movie," and he had difficulty interacting with the other people there.  (R. 20–21.)  Plaintiff stated that therapy was not working for him because participants had to state why they were in therapy and the other patients "have a right to . . . maybe argue with you or question what you said."  (R. 21.)  His ability to handle stress is "not

that great," he does not have problems with his short-term or long-term memory, and when he gets stressed he gets "tensed up, anxious, nervous," and sweaty with a rapid heartbeat. (R. 21.)

### ii.   VE testimony

The VE testified at the October 2, 2018 administrative hearing. (R. 22–28.) The ALJ asked the VE to consider several hypothetical individuals of the same age, education, and work background as Plaintiff. (R. 23–28.) The first hypothetical individual could perform "all levels of work as defined by the regulations" but was limited to "no concentrated exposure to extreme heat, cold, wetness, or humidity, or respiratory irritants; and occupations performed in a low stress setting defined as requiring no assembly line, no fast[-]paced production requirements, no more than occasional changes in the work routine or work setting, and little independent decision-making or goal setting." (R. 23.) The VE testified that such an individual could work jobs in the national economy such as a racker in the baking industry, a bagger in the garment industry, and a dryer attendant in the garment industry, which is "just a monitoring position." (R. 24.) In response to a question from Plaintiff's attorney regarding the duties of a racker and a bagger, the VE stated that a racker would take baked items off a conveyor after they have cooled, "put them on . . . aluminum racks," and "wheel them into . . . a certain area," such as a warehouse for storage. (R. 25.) The VE described the bagger position as a "[v]ery simple, routine, static position" and stated that a bagger puts "a clear plastic bag over" garment items and "tie[s] a knot in the bottom." (R. 25–26.) The VE testified that both positions are goal-oriented, static, and do not involve rapid production or a fast-paced work environment. (R. 26.)

The second hypothetical individual had all the limitations of the first individual, as well as the additional limitation of "occasional contact with the public." (R. 24.) The VE testified that such an individual could perform the same jobs as the first individual because those

"positions have no contact or interaction with the general public." (R. 24.) The ALJ asked about employers' tolerance for "time off task and absences from the work place." (R. 24.) The VE testified that "any off-task rate that would be above [ten percent] on a regular, consistent basis would not be tolerated" and that "any absenteeism rate above one day per month on a regular, consistent basis will not be tolerated, and anything above those two levels would be work preclusive." (R. 24–25.) The ALJ also asked about the amount of training required for the racker, bagger, and dryer attendant positions. (R. 25.) The VE testified that those positions would require only a "short demonstration" that would generally last "the first few hours of the work day" when the employee was newly hired. (R. 25.)

The third hypothetical individual also had all the limitations of the first individual, as well as the additional limitation of "no tandem work and only occasional contact with a supervisor." (R. 26.) The VE testified that such an individual could still perform the same three jobs because they involved "individual tasks" that are assigned in the morning and the individual has all day to complete those tasks without "interaction with a co-worker [on] more than an occasional basis" and without more than one or two check-ins from a supervisor who would "maybe not even interact, just take a look to make sure the person's still working." (R. 27.) The ALJ asked whether the individual would be working in tandem with others, and the VE clarified that while the individual would not be "in an isolated area" because there "would be co-workers around doing other jobs in the same area," they "wouldn't necessarily have to interact to complete these duties." (R. 27.)

### b.   The ALJ's decision

The ALJ conducted the five-step sequential analysis required by the SSA.[3]  (R. 51–60).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since

May 31, 2016,[4] because Plaintiff's recent work "ended after a short period of time" due to "stress

on the job" and are considered "unsuccessful work attempts."  (R. 52.)  At step two, the ALJ

found that Plaintiff had the following severe impairments: depression, anxiety, and asthma.  (R.

52.)  The ALJ also found that these impairments "significantly limit [Plaintiff's] ability to

perform basic work activities."  (R. 52.)

At step three, the ALJ found that Plaintiff did not have a severe impairment or

combination of impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 52–53.)  The

ALJ found that Plaintiff did not meet the requirements of section 3.03 for asthma because

Plaintiff did not meet the requirements "in terms of test results or frequency of treatment."  (R.

52.)  The ALJ found that Plaintiff did not meet the requirements of section 12.04 for depressive

disorders or section 12.06 for anxiety because while "the claimant has severe symptoms of

---

[3]  The five-step sequential process outlined by the SSA considers:
>  (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a 'residual functional capacity' assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience."

*Demars v. Comm'r of Soc. Sec.*, 841 F. App'x 258, 260–61 (2d Cir. 2021) (quoting *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019)).

[4]  The Court notes that while the ALJ stated that Plaintiff applied for SSI on May 31, 2016, (*see* R. 52), Plaintiff's SSI application contained in the record provides June 1, 2016, as the date of his application, (*see* R. 150).

mental impairments, he does not meet the Part B criteria for these listings." (R. 52–53.) In support, the ALJ found that Plaintiff has moderate limitations in "understanding, remembering, or applying information," "interacting with others," and "concentrating, persisting or maintaining pace," and that Plaintiff has a mild limitation in "adapting or managing oneself." (R. 53.) The ALJ concluded that Plaintiff was not disabled because Plaintiff did not have "at least two marked limitations or one extreme limitation," he did not meet the Part B criteria and did not meet the "'serious and persistent' disorder requirement" under Part C of the Social Security Regulations. (R. 53.)

At step four, the ALJ determined that Plaintiff has the residual functional capacity ("RFC") to perform a "full range of work at all exertional levels" with nonexertional limitations. (R. 53.) The ALJ found that Plaintiff is limited to work with "no concentrated exposure to extreme heat and cold, wetness and humidity, or other respiratory irritants" and to work in occupations "performed in a low stress setting, defined as requiring no assembly line, no fast-paced production requirements, no more than occasional changes in work routine or work setting, and little independent decision making or goal setting." (R. 53.) The ALJ also determined that Plaintiff was limited to occupations involving "occasional contact with the public." (R. 53.)

In determining Plaintiff's RFC, the ALJ considered Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms and stated that they are "not entirely consistent with the medical evidence and other evidence in the record." (R. 57.) The ALJ found that Plaintiff's statements that he is unable to work "due to severe psychiatric disorders" was not consistent with the level of severity present in the medical evidence because while Plaintiff stated at his consultative examination "that he is unable to go out on his own[] and can only

travel with his mother," the medical records show "frequent and independent visits to multiple medical facilities, active participation in support groups, and . . . traveling to obtain employment." (R. 57.) In addition, the ALJ noted that Plaintiff "frequently stopped using medication on his own, and [had] not attended scheduled treatment sessions" and the regulations "require that an individual must adhere to prescribed treatment from their medical sources in order to receive disability benefits." (R. 57 (citing 20 C.F.R. 404.1530).)

The ALJ assigned "[g]reat weight" to the opinion of Dr. S. Shapiro, Ph.D., the state agency staff psychologist, who opined that although Plaintiff had severe symptoms of depression and anxiety, his "most recent problems were managed with medication" because the opinion "was provided by a medical professional with good knowledge of disability guidelines, and was an opinion that was very consistent with the medical evidence." (R. 57.) The ALJ assigned "[s]ome weight" to the opinions expressed by Dr. Toula Georgiou in connection with the psychiatric consultative examination because Dr. Georgiou's opinions were "non-specific," "based on a one-time only examination" and "were not entirely consistent with the medical examination." (R. 58.)

The ALJ assigned "[g]reater weight" to Plaintiff's treating professionals, including Dr. Partyka's opinion that Plaintiff had a "logical thought process, without hallucinations or delusions" and was later stable after initiating medication, mental health clinician Cyndi Kantor's opinion that Plaintiff had "mild panic attacks," mental health clinician Jeremy Liftin's opinion that Plaintiff reported that he was depressed ten percent of the time but stopped "attending therapy sessions and using prescribed medications shortly afterwards," and therapist Eileen Chiu's observations that Plaintiff missed appointments because "he refused to sign in and reported that he was actively looking for work." (R. 58.) The ALJ found that these reports

"provided considerable evidence that the claimant retained sufficient mental health capability to participate in looking for work and performing unskilled work in a satisfactory manner" because he is "capable of following supervision, sustaining attention and concentration for an extended period, learning new skills, and adequately responding to changes in a work setting."  (R. 58.)

The ALJ assigned "great weight" to Dr. Lyudmila Trimba, who performed the internist consultative examination and opined that Plaintiff had "no physical limitations, except for asthma-related difficulties."  (R. 58.)  The ALJ determined that Plaintiff could "perform a wide range of unskilled work in all exertional categories."  (R. 58.)

In the final step of the analysis, the ALJ found that Plaintiff did not have past relevant work, but that other jobs exist in significant numbers in the national economy that Plaintiff can perform.  (R. 58–59.)  Relying on the VE's testimony, the ALJ concluded that Plaintiff could work as a racker, a bagger, or a dryer attendant and that the performance of these jobs would not be affected by Plaintiff's limitations because they are jobs "that are performed with little interaction with co-workers and supervisors, and almost no interaction with the public."  (R. 59.)  As a result, the ALJ determined that Plaintiff was "not disabled."  (R. 59–60.)

**II. Discussion**

    **a.  Standard of review**

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005) (citing *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002)); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).  "Substantial evidence means more than a mere scintilla.  It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Sczepanski v. Saul*, 946 F.3d 152, 157 (2d Cir.

2020) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).  Once an ALJ finds facts, the

court "can reject those facts only if a reasonable factfinder would have to conclude otherwise."

*Talyosef v. Saul*, 848 F. App'x 47, 48 (2d Cir. 2021) (quoting *Brault v. Soc. Sec. Admin.*, 683

F.3d 443, 448 (2d Cir. 2012)).  In deciding whether substantial evidence exists, the court will

"defer to the Commissioner's resolution of conflicting evidence."  *Smith v. Berryhill*, 740 F.

App'x 721, 726 (2d Cir. 2018) (quoting *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir.

2012)).  If, however, the Commissioner's decision is not supported by substantial evidence or is

based on legal error, a court may set aside the Commissioner's decision.  *See Ewen v. Saul*, No.

19-CV-9394, 2021 WL 1143288, at *11 (S.D.N.Y. Mar. 23, 2021) (citing *Moran*, 569 F.3d at

112)); *see also Prince v. Astrue*, 514 F. App'x 18, 20 (2d Cir. 2013) (citing *Burgess v. Astrue*,

537 F.3d 117, 128 (2d Cir. 2008)).

   **b.   The ALJ failed to properly assess Plaintiff's RFC because the record was not
          fully developed**

   Plaintiff argues that the ALJ's RFC determination was flawed because the ALJ

(1) selectively considered evidence showing that his mental limitations were benign while

"overlooking the evidence of more severe limitations," (2) improperly assessed medical records

as though they were opinions, (3) relied too heavily on statements by nonexamining sources, (4)

failed to properly assess Plaintiff's subjective complaints, and (5) failed to consider the reasons

that Plaintiff failed to comply with his treatment plan.[5]  (Pl.'s Mem. 18–24.)

---

   [5]  The Court only addresses the ALJ's RFC determination as to his mental health-related
limitations, as Plaintiff does not challenge the ALJ's RFC determination due to asthma.  (*See
generally* Pl.'s Mem.)

The Commissioner argues that the ALJ properly (1) considered the clinical findings and observations regarding Plaintiff's mental symptoms, (2) considered whether substantial evidence supports the ALJ's evaluation of medical opinion evidence, (3) weighed the opinions of nonexamining sources because the consultants are "highly qualified specialists whose opinions the ALJ is required to consider," (4) evaluated Plaintiff's subjective complaints, and (5) considered Plaintiff's lack of compliance with his prescribed treatment because the ALJ considered possible reasons for his lack of compliance.  (Comm'r's Mem. 16–24.)

### i. The ALJ failed to adequately develop the record to obtain functional assessments from Plaintiff's treating providers

Plaintiff does not expressly argue that the ALJ failed to properly assess the record. However, Plaintiff implies that the record is not complete because the ALJ did not consider medical opinions from Plaintiff's treating physicians and instead relies on (1) the opinions of nontreating and nonexamining consultative sources, and (2) relies on medical records instead of opinion evidence.  (Pl.'s Mem. 20–21.)  Plaintiff argues that the ALJ applied great weight to selected medical records from mental health clinicians Kantor and Liftin, therapist Chiu, and consultative examiner Dr. Shapiro, but only sifted through medical records from Plaintiff's treating providers to "select psychiatric findings to largely discount limitations from mental disorders."  (*Id.* at 19.)  In support, Plaintiff argues that the ALJ "weighs the medical records as though they are medical opinions," but "treatment notes lacking functional assessments are not opinions to be weighed" and the records given great weight "do not assess restrictions."  (*Id.* at 21.)  Plaintiff contends that the ALJ's reliance on Plaintiff's treatment records constitutes a selective and incomplete assessment of the record, that the ALJ overlooked records demonstrating greater limitations, and that the ALJ "fails to put [benign findings] in context." (R. 19–22.)

The Commissioner argues that the ALJ properly considered the evidence because the ALJ cited specific clinical findings, provided "[g]reater weight" to the "records of [Plaintiff's] treating professionals," found Plaintiff's "treatment records to be more significant than" the opinion of consultative examiner Dr. Georgiou, and "considered several factors in evaluating Plaintiff's RFC, including the medical evidence, non-medical evidence, and Plaintiff's statements about what he could do." (Comm'r's Mem. 18–20.)  In addition, the Commissioner argues that to the extent Plaintiff "suggests a non-examining doctor's opinion can never be granted as much weight as a treating source's opinion, this is simply not true" because "state agency consultants are highly qualified specialists whose opinions the ALJ is required to consider." (*Id.* at 21.)  The Commissioner argues that while Plaintiff "would have weighed the evidence differently," the Commissioner's findings of fact "must be upheld unless 'a reasonable factfinder would *have to conclude otherwise*.'" (*Id.* at 21.)

A district court must ensure that the ALJ has adequately developed the record in accordance with 20 C.F.R. § 404.1520(a)(3), which requires an ALJ to consider all evidence in the case record when making a determination or decision on a claimant's disability.  *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009) ("[I]t is the rule in our circuit that the [social security] ALJ, unlike a judge in a trial, must [on behalf of all claimants] . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." (alterations in original) (quoting *Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir. 1999))).  Although a "claimant has the general burden of proving that he or she has a disability within the meaning of the Act," *Sczepanski*, 946 F.3d at 158  (citing *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014)), "[b]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative

record," *Burgess*, 537 F.3d at 128 (alteration in original) (quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)); *see also Yucekus v. Comm'r of Soc. Sec.*, 829 F. App'x 553, 558 (2d Cir. 2020) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel[.]" (alterations in original) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 n.1 (2d Cir. 2013) ("Unlike a judge at trial, the ALJ has a duty to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" (quoting *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011))).  This duty is present "[e]ven when a claimant is represented by counsel."  *Moran*, 569 F.3d at 112 (collecting cases); *see also Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) ("[T]he ALJ's general duty to develop the administrative record applies even where the applicant is represented by counsel . . . ." (citing *Rosa*, 168 F.3d at 79)); *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 279 (N.D.N.Y. 2009) ("[A]n ALJ has an affirmative duty to develop the record, even if the claimant is represented by counsel, if the medical record is ambiguous or incomplete." (first citing *Tejada*, 167 F.3d at 774; and then citing *Rosa*, 168 F.3d at 79)).  In addition, the ALJ must attempt to fill in gaps in the record.  *See Blash v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 642, 645 (2d Cir. 2020) ("When there is an obvious or 'clear gap[]' in the record, the ALJ is required to seek out missing medical records, even when a party is represented by counsel." (alteration in original) (quoting *Rosa*, 168 F.3d at 79)); *Rosa*, 168 F.3d at 79 & n.5 (explaining that the ALJ must attempt to fill "clear gaps" in the record, but "where there are no obvious gaps . . . and where the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996))).

The duty to develop obligates the Commissioner "to develop a complete medical record," *Blash*, 813 F. App'x at 645 (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996); and then citing 20 C.F.R. § 404.1512(b)), which is "detailed enough to allow the ALJ to determine the claimant's RFC," *Sigmen v. Colvin*, No. 13-CV-268, 2015 WL 251768, at \*11 (E.D.N.Y. Jan. 20, 2015) (citing *Casino-Ortiz v. Astrue*, No. 06-CV-155, 2007 WL 2745704, at \*7 (S.D.N.Y. Sept. 21, 2007), *report and recommendation adopted*, 2008 WL 461375 (Feb. 20, 2008)). Pursuant to the SSA regulations, the Commissioner is obligated to "make every reasonable effort to help [the claimant] get medical evidence from [his] own medical sources and entities that maintain [his] medical sources' evidence when [the claimant] give[s] . . . permission to request the reports." 20 C.F.R. § 404.1512(b)(1); *see also Perez*, 77 F.3d at 47. The Commissioner's duty to make such efforts includes the duty to seek, as part of such medical evidence and reports, a medical source statement or functional assessment detailing the claimant's limitations. *See Robins v. Astrue*, No. 10-CV-3281, 2011 WL 2446371, at \*3 (E.D.N.Y. June 15, 2011) ("[SSR] 96-5p confirms that the Commissioner interprets those regulations to mean that '[a]djudicators are generally required to request that acceptable medical sources provide these statements with their medical reports.'" (alteration in original) (quoting SSR 96-5p)). Failing to adequately develop the record is an independent ground for vacating the ALJ's decision and remanding for further findings. *See Rosa*, 168 F.3d at 83 (finding remand "particularly appropriate" where the ALJ failed to obtain adequate information from treating physicians and potentially relevant information from other doctors); *see also Morris v. Berryhill*, 721 F. App'x 25, 27 (2d Cir. 2018) ("Failure to develop the record warrants remand." (first citing *Rosa*, 168 F.3d at 79–80; and then citing *Moran*, 569 F.3d at 113–15)); *Green v. Astrue*, No. 08-CV-8435, 2012 WL 1414294, at \*14 (S.D.N.Y. Apr. 24, 2012) ("[F]ailure to develop the record adequately is an independent

16

ground for vacating the ALJ's decision and remanding the case." (citing *Moran*, 569 F.3d at 114–15)), *report and recommendation adopted*, 2012 WL 3069570 (S.D.N.Y. July 26, 2012). Nevertheless, even where an ALJ fails to develop the opinion of a treating physician, remand may not be required "where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's [RFC]." *Tankisi*, 521 F. App'x at 34.

The ALJ failed to develop the record because the ALJ did not seek functional assessments from Plaintiff's treating physicians when the record consisted of only medical notes and records. The ALJ's decision demonstrates that the ALJ drew conclusions from Plaintiff's medical records as opposed to functional assessments from Plaintiff's treating physicians. For example, the ALJ relied on medical notes from Dr. Partyka that stated that Plaintiff had a "logical thought process, without hallucinations or delusions, and later, after initiating medication, less depressed and anxious." (R. 58.) The ALJ also cited notes from Plaintiff's visit with Kantor that "identified only mild panic attacks," from Liftin that "noted several specific psychiatric problems that the claimant needed to address," and from Chiu who "observed that the [Plaintiff] had an invariably euthymic mood, with hesitant speech, normal memory, normal psychomotor activity, no sign of disorganization, no hallucinations and adequate attention and concentration." (R. 58.) The ALJ noted that Plaintiff missed one of his therapy sessions because he "refused to sign in" and suggested that this was a "common procedure that he was most likely familiar with." (R. 58.) The ALJ relied on these reports to conclude that there was "considerable evidence that the claimant retained sufficient mental health capability to participate in looking for work and performing unskilled work in a satisfactory manner," and that Plaintiff was "capable of following supervision, sustaining attention and concentration for an extended period, learning new skills, and adequately responding to changes in a work setting."

(R. 58.)  As Plaintiff notes, none of these records assess Plaintiff's restrictions or provide an assessment of his functional limitations.  (*See* R. 311–15, 435–36, 441–48, 462, 600–04.)

A searching review of the record reveals that the record largely consists of medical notes from Plaintiff's visits with his providers and does not identify any functional assessments from Plaintiff's providers aside from that offered in the consultative reports.  For example, all of Plaintiff's medical records from Dr. Jose Perez, Dr. Partyka, and Dr. Nagmo Fatakhova, whom he saw on a consistent basis between May of 2016 and October of 2017, indicate that Plaintiff had ongoing mental health issues necessitating treatment for over a year.  (R. 299–358.) However, the records relied on are primarily medical notes describing his symptoms and examinations that do not assess his functional capacity.  (*See id.*)  Similarly, none of the providers from whom Plaintiff received treatment at the IFH or at Community Counseling and Mediation provided functional assessments; their treatment records consist largely of session notes and reports of how the Plaintiff was feeling on the particular day that he was seen.  (R. 384, 390–491, 504–47, 563, 600–19.)  The lack of functional assessments from Plaintiff's providers constitutes an evidentiary gap in the record warranting further development on remand.  *See Obremski v. Kijakazi*, No. 20-CV-3902, 2021 WL 3163169, at *10 (S.D.N.Y. July 27, 2021) (remanding for failure to develop the record because the ALJ, "consistent with her duty to develop the record, should have affirmatively sought . . . a function-by-function analysis" instead of disregarding the treating physician's opinion and stating that "the 'treating physician rule' is inextricably linked to a broader duty to develop the record . . . [and] [p]roper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination" (quoting *Lacava v. Astrue*, No. 11-CV-7727, 2012 WL 6621731, at *13

(S.D.N.Y. Nov. 27, 2012))); *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-0502, 2021 WL 363682, at *11 (S.D.N.Y. Jan. 29, 2021) (finding that the ALJ failed to develop the record as to the plaintiff's mental impairments because the ALJ "should have requested a functional assessment of [the plaintiff's] mental capacity from later in her treatment to better understand the impact of treatment over time" when the record only contained an early functional assessment at the start of the plaintiff's treatment and two consultive exams, and stating that "[c]ourts in this Circuit have consistently held, albeit . . . in the treating physicians context, that when an ALJ has to determine an RFC, their failure to request a functional assessment when no such assessment exists in the record, or when any such assessments are insufficient, is a failure of their duty to develop the record"); *Lee v. Saul*, No. 19-CV-9451, 2020 WL 5362619, at *17 (S.D.N.Y. Sept. 8, 2020) ("[L]eft without a viable medical opinion setting forth [the plaintiff's] functional limitations and abilities, the RFC is largely supported by the ALJ's own interpretation of the medical records, including the MRIs and X-rays contained therein. . . . Given the lack of any controlling medical opinion — or at least one that the ALJ did not largely discount — the ALJ has improperly filled this evidentiary void with his own medical judgment and interpretation of these records."); *Merriman v. Comm'r of Soc. Sec.*, No. 14-CV-3510, 2015 WL 5472934, at *17–19 (S.D.N.Y. Sept. 17, 2015) (finding that the ALJ "failed in his duty to develop the record fully" when the ALJ did "not cite any functional assessments in support of his finding that plaintiff retained the RFC to perform medium work" and "[t]he only medical evidence in the record cited by the ALJ in support of his physical RFC determination is . . . treatment notes," but "[t]reatment notes, however, are not ordinarily a substitute for a treating physician's opinion, and [the doctor's] treatment notes do not address plaintiff's exertional and nonexertional limitations"); *Legall v. Colvin*, No. 13-CV-1426, 2014 WL 4494753, at *4 (S.D.N.Y. Sept. 10,

2014) (finding that the ALJ failed to develop the record by not seeking a medical opinion from the plaintiff's treating physicians or other acceptable medical source when the "only medical evidence in the record cited by the ALJ in support of his RFC determination is [the plaintiff's] treatment records"); *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 348 (E.D.N.Y. 2010) ("[T]he ALJ failed to obtain an adequate medical assessment of [the plaintiff's] functional abilities. . . . [T]he record contains no opinions from any of [the plaintiff's] treating physicians regarding his functional abilities during the relevant period."); *see also* 20 C.F.R. § 404.1512 ("Generally, we will not request a consultative examination until we have made every reasonable effort to obtain evidence from your own medical sources.").

To the extent that the ALJ relied on functional assessments from Plaintiff's consultative examiners instead of Plaintiff's treating providers, the ALJ was not permitted to do so without first seeking clarification from Plaintiff's long-term providers.[6] *See Mary D. v. Kijakazi*, No. 20-CV-656, 2021 WL 3910003, at *9–10 (D. Conn. Sept. 1, 2021) ("To further develop the record with treating source opinions, the ALJ should have sought clarification or further evidence from . . . plaintiff's long-time cardiologist, before according greater weight to the testimony of a medical expert who did not examine plaintiff. . . . Without further development of the treating source opinions, the administrative record was not sufficient to enable the ALJ to produce a reasoned RFC determination."); *Prieto v. Comm'r of Soc. Sec.*, No. 20-CV-3941, 2021 WL 3475625, at *10 (S.D.N.Y. Aug. 6, 2021) (remanding for an ALJ's failure to develop the record

---

[6] The Court notes that the ALJ provided "some weight" to the functional assessment provided by consultative examiner Dr. Georgiou who opined that the "results of [Plaintiff's] present evaluation appear to be consistent with psychiatric difficulties, and that this may significantly interfere with the [Plaintiff's] ability to function on a daily basis." (R. 305.) However, even Dr. Georgiou's opinion was not given substantial weight as the ALJ discounted it as "non-specific," "based on a one-time only examination" and "not entirely consistent with the medical examination," (R. 58), but then failed to seek an alternative functional assessment.

by obtaining a functional assessment from the plaintiff's treating physicians despite having a

consultative examiner's opinion in the record and stating that "'[c]ourts in this Circuit have held

on multiple occasions,' albeit in the treating physician context, 'that remand is required when

ALJs fail to satisfy their duty to develop the record . . . by failing to request (and receive) a

functional assessment from the treating physicians'" (quoting *Romero v. Comm'r of Soc. Sec.*,

No. 18-CV-10248, 2020 WL 3412936, at *13 (S.D.N.Y. June 22, 2020))); *Haskins v. Astrue*, No.

08-CV-1107, 2010 WL 3338742, at *5 (N.D.N.Y. Apr. 23, 2010) (finding that the ALJ failed to

develop the record because "no opinion evidence concerning [the plaintiff's] ability to work

despite his limitations was created during the relevant time period" and "no physician offered a

retrospective opinion of [the plaintiff's] functional limitations before his [date last insured]"

including a consultative examiner, and instructing the ALJ to "first re-contact[] [the plaintiff's]

treating physicians" because "the ALJ has an affirmative obligation to make reasonable efforts to

obtain from [the plaintiff's] treating physicians any necessary reports, including an assessment of

[the plaintiff's] functional limitations"), *report and recommendation adopted*, 2010 WL 3338748

(N.D.N.Y. Aug. 23, 2010).

Accordingly, the Court finds that the ALJ failed to adequately develop the record to

obtain a functional assessment of Plaintiff's RFC.[7]

---

[7]  The Court notes that the ALJ omits assigning any weight to or analyzing the records of
several of Plaintiff's treating physicians, most notably Dr. Fatakhova who Plaintiff saw for over
a year from June of 2016 until October of 2017.  (*See* R. 50–60.)  An ALJ "must follow" specific
procedures "in determining the appropriate weight to assign a treating physician's opinion,"
including deciding "whether the opinion is entitled to controlling weight."  *Estrella v. Berryhill*,
925 F.3d 90, 95 (2d Cir. 2019); *see also Ferraro v. Saul*, 806 F. App'x 13, 14 (2d Cir. 2020)
(holding that "[u]nder Second Circuit precedent and the applicable regulations," the ALJ must
follow the two-step procedure laid out in *Estrella* to determine the appropriate weight to assign
to the opinion of a treating physician); *Leah H. v. Comm'r of Soc. Sec.*, No. 3:20-CV-455, 2021
WL 4033129, at *10 (N.D.N.Y. Sept. 3, 2021) ("[U]nder the treating physician rule, the Appeals

      **ii.   The Court cannot further assess whether the ALJ's findings were supported by substantial evidence and whether the ALJ properly assessed Plaintiff's subjective report**

The Court is unable to review whether the ALJ's denial of benefits was based on substantial evidence in the record and whether the ALJ properly assessed Plaintiff's subjective report because the ALJ failed to develop the record. *See Mary D.*, 2021 WL 3910003, at *10 ("Because the ALJ's failure to develop the record is a threshold issue that impacts all aspects of a disability claim, the [c]ourt declines to address the other arguments that plaintiff raised in her brief."); *Baez v. Comm'r of Soc. Sec.*, No. 17-CV-3595, 2018 WL 4688951, at *9 (E.D.N.Y. Sept. 28, 2018) ("As the Court has previously noted, where 'an ALJ fails to adequately develop the record in reaching a conclusion as to a claimant's residual functional capacity, the Court is unable to review whether the ALJ's denial of benefits was based on substantial evidence.'" (quoting *Rivera v. Comm'r of Soc. Sec.*, No. 15-CV-837, 2016 WL 614688, at *15 (E.D.N.Y. Feb. 16, 2016))); *Corona v. Berryhill*, No. 15-CV-7117, 2017 WL 1133341, at *18 (E.D.N.Y. Mar. 24, 2017) (declining to address arguments as to whether the ALJ properly assessed the plaintiff's credibility when remanding for failure to develop the record); *Mantovani v. Astrue*, No. 09-CV-3957, 2011 WL 1304148, at *4 (E.D.N.Y. Mar 31, 2011) (noting that when the ALJ

---

Council was obligated to explain what weight — if any — it was affording to [the doctor's] opinion and provide an explanation for its decision.  The Appeals Council not only failed to provide 'good reasons' for disregarding the opinion of an apparent treating physician, it did not provide any reasons.  In this case, such failure is reversible error."); *Callahan v. Berryhill*, No. 17-CV-4920, 2020 WL 7000732, at *16 (E.D.N.Y. Aug. 11, 2020) ("In the event the ALJ affords less than controlling weight to a treating source's opinion or otherwise fails to specifically set forth the overall weight the opinion was given (whether controlling weight or some lesser weight), the regulations generally require remand to the Commissioner for further factual findings."), *report and recommendation adopted*, 2020 WL 6193657 (E.D.N.Y. Oct. 22, 2020).  Because the Court finds that there is an evidentiary gap as to opinions on Plaintiff's functional limitations, the Court does not decide whether the ALJ violated the treating physician rule by failing to discuss records from Plaintiff's treating providers.

fails to develop the record, "the [c]ourt need not — indeed, cannot — reach the question of whether the [ALJ's] denial of benefits was based on substantial evidence.") (alteration in original) (quoting *Jones v. Apfel*, 66 F. Supp. 2d 518, 542 (S.D.N.Y. 1999))); *Ayer v. Astrue*, No. 11-CV-83, 2012 WL 381784, at *7 (D. Vt. Feb. 6, 2012) (declining to address arguments as to whether the plaintiff was disabled because the administrative law judge failed to adequately develop the record). Accordingly, the Court remands for the ALJ to further develop the factual record. *See Butts*, 388 F.3d at 385 ("That is, when 'further findings would so plainly help to assure the proper disposition of [the] claim, we believe that remand is particularly appropriate.'" (alteration in the original) (quoting *Rosa*, 168 F.3d at 83)); *Mantovani*, 2011 WL 1304148, at *4.

**III.  Conclusion**

For the foregoing reasons, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion for judgment on the pleadings. The Commissioner's decision is vacated and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

Dated:  September 26, 2021
        Brooklyn, New York

                              SO ORDERED:


                              ___s/ MKB_____
                              MARGO K. BRODIE
                              United States District Judge